**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NATHANIEL S. MCCRAY,                    )
                                        )
          Plaintiff,                    )
                                        )          No. 21-cv-00409
     v.                                 )
                                        )          Judge Andrea R. Wood
CATALINO BAUTISTA, et al.,              )
                                        )
          Defendants.                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Nathaniel S. McCray brought this action against Defendants Catalino Bautista[1]

and Wexford Health Sources, Inc. ("Wexford") under 42 U.S.C. § 1983, claiming that they

violated his Eighth Amendment rights by acting with deliberate indifference to the pain and

numbness that he was experiencing in his wrist and hand. McCray was eventually diagnosed

with carpal tunnel syndrome—a diagnosis he believes would have come sooner had Defendants

treated his condition properly. Defendants now seek summary judgment in their favor pursuant

to Federal Rule of Civil Procedure 56. (Dkt. No. 50.) For the reasons stated below, their motion

is granted.

## BACKGROUND

The following facts are drawn from the parties' submissions pursuant to Local Rule 56.1.

(Pl.'s Resp. to Defs.' Statement of Material Facts ("PRDSF"), Dkt. No. 58; Defs.' Resp. to Pl.'s

Statement of Additional Material Facts ("DRPSAF"), Dkt. No. 60.)[2]

---

[1] Dr. Bautista's last name is misspelled "Bautise" in the First Amended Complaint.

[2] The parties raise numerous objections to each other's submissions, largely citing supposed evidentiary gaps. To the extent there are gaps in the evidence, however, those gaps did not impede the Court's assessment of the record. Thus, the Court will not exercise its "broad discretion" to strike any portion of the Rule 56.1 submissions. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371,

McCray is an inmate at Stateville Correctional Center ("Stateville"). (PRDSF ¶ 1.) In May 2017, he began experiencing pain and numbness in his left hand, as well as pain in his neck and trapezius, while wearing "black box" restraints. (*Id.* ¶ 8.) Black-box restraints "are handcuffs with a black metal box over the chain between cuffs to prevent an inmate from tampering with the restraints." (*Id.* ¶ 7.) A medical provider may issue a permit for a "waist chain" to be used instead of black-box restraints if an inmate has medical concerns that warrant such an alternative measure. (*Id.*) During May and June 2018, McCray met with medical personnel multiple times regarding his request for a waist-chain permit and his corresponding symptoms. (*Id.* ¶¶ 6, 9–16.)

On July 5, 2018, McCray had an appointment with Dr. Okezie, the medical director at Stateville. (*Id.* ¶ 17.) McCray reported numbness and tingling in his hands, as well as pain in his left shoulder, and Dr. Okezie diagnosed him with "left shoulder pain and paresthesia in [his] left fourth and fifth fingers." (*Id.*) Dr. Okezie prescribed a waist-chain permit and submitted a request to refer McCray to an orthopedist for his shoulder pain. (*Id.*)

But during a collegial review on July 10, 2018, that referral request was denied. (*Id.* ¶¶ 18–19.) The decision was based in part on "recent" x-ray results that had come back "negative for any pertinent findings" (*id.* ¶ 19)—ostensibly, a reference to the x-rays of McCray's "cervical spine, thoracic spine, left wrist, and left elbow" taken in June 2018 (*id.* ¶¶ 14–15). An "alternative treatment plan" was implemented for McCray's shoulder pain, consisting of on-site treatment that included physical therapy. (*Id.* ¶ 19.) If such methods proved ineffective, the

---

382 n.2 (7th Cir. 2008); *see also Oxford Bank & Tr. & Fifth Ave. Prop. Mgmt. v. Village of La Grange*, 879 F. Supp. 2d 954, 960 (N.D. Ill. 2012) ("[M]otions to strike are disfavored in summary judgment proceedings unless they expedite the Court's work."). And with respect to the parties' challenges to what they describe as "self-serving" declarations, the Seventh Circuit has repeatedly explained that such an objection carries little weight. *See, e.g.*, *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) ("Self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." (internal quotation marks omitted)).

alternative treatment plan contemplated that the referral would then be "represent[ed]" to the collegial-review board. (*Id.*; *see also* Defs.' Statement of Material Facts, Ex. B ("Bautista Dep.") at 53:16–54:20, Dkt. No. 51-2.) McCray eventually had a physical-therapy evaluation in early 2019 (PRDSF ¶ 29); he attended some, not all, of the subsequent physical-therapy appointments over the next few months (*id.* ¶¶ 30, 32–36, 39–41).

Meanwhile, following his appointment with Dr. Okezie, McCray attended more medical appointments during which he complained about his ongoing symptoms. (*Id.* ¶¶ 20–25.) His first visit with Dr. Bautista occurred on December 12, 2018. (*Id.* ¶ 26.) Ultimately, McCray would have a total of ten appointments with Dr. Bautista between December 2018 and February 2020. (DRPSAF ¶ 19.) According to McCray, "[e]ach time [he] saw Dr. Bautista," he told Dr. Bautista the treatment was "not working" and "requested a referral to an outside specialist." (*Id.* ¶ 20.) Defendants dispute that McCray's complaints were so uniform and consistent. (*Id.*) The Court describes the relevant appointments in greater detail below.

At the initial appointment, on December 12, 2018, McCray reported numbness in his left hand and arm, as well as pain in his neck and shoulder. (PRDSF ¶ 26.) During his examination, Dr. Bautista "found no tenderness at the joint area" of McCray's left shoulder and noted that the "passive abduction and flexion on his left arm" was "normal." (*Id.* ¶ 27.) Dr. Bautista diagnosed McCray with "left shoulder pain and neuropathy/radiculopathy." (*Id.*) He prescribed Indocin for pain relief and Nortriptyline for the nerve issues in McCray's left arm. (*Id.* ¶ 28.) He also planned to renew the waist-chain permit. (*Id.*)

McCray's next appointment with Dr. Bautista was on February 26, 2019. (*Id.* ¶ 31.) McCray indicated that he was still experiencing numbness in his left arm, and Dr. Bautista assessed him as having "allergic rhinitis and left arm neuropathy." (*Id.*) Dr. Bautista again

3

prescribed Indocin and Nortriptyline, the latter at a higher dosage than before. (*Id.*) He also prescribed medication for dermatitis and a nasal spray for allergies. (*Id.* ¶¶ 23, 31.)

McCray had a follow-up appointment with Dr. Bautista on May 21, 2019, at which point he had been discharged from physical therapy. (*Id.* ¶¶ 41–42.) McCray complained of continued numbness and a burning sensation in his hand, symptoms the parties agree were consistent with a diagnosis of left arm neuropathy. (*Id.* ¶ 42.) Dr. Bautista prescribed yet another "gradual dosage increase" in McCray's Nortriptyline prescription. (*Id.*)

Their next appointment was on July 16, 2019. (*Id.* ¶ 45.) McCray told Dr. Bautista that the physical therapy had helped address the pain in his left elbow and left shoulder. (*Id.*) On the other hand, McCray reported continuing pain behind his left clavicle, as well as numbness of the fourth and fifth fingers on his left hand. (*Id.*) He further complained that the Nortriptyline "made him tired." (*Id.*) Citing in part the x-ray results mentioned above, along with an examination and McCray's statements during the appointment, Dr. Bautista once more assessed McCray with neuropathy. (*Id.*) Dr. Bautista planned to "taper" McCray off the Nortriptyline before replacing it with Cymbalta. (*Id.*; *see also* Defs.' Statement of Material Facts, Ex. C ("Bautista Decl.") ¶ 66 (listing Cymbalta, like Nortriptyline, as a "nerve pain medication[]").)

Dr. Bautista saw McCray three times between August 2019 and September 9, 2019, in connection with a rash McCray had developed. (PRDSF ¶¶ 46–48.) There appears to be no dispute that the primary purpose of these appointments was to treat the rash. (*See id.*) But the parties disagree over whether McCray also complained about pain in his left arm—Defendants say he did not, whereas McCray insists he did. (PRDSF ¶¶ 46–48; DRPSAF ¶ 20.) Even assuming McCray is correct, the record does not indicate what he said at these appointments.

On September 17, 2019, McCray saw Dr. Bautista for a follow-up appointment related to his nerve pain. (PRDSF ¶ 49.) McCray said he was experiencing "depression" from his use of Cymbalta and was concerned the medication may cause erectile dysfunction. (*Id.*) Dr. Bautista assessed him with "self-reported shooting pain in the back of his left clavicle" and "numbness" in the fourth and fifth fingers of his left hand. (*Id.*) Given the complaints about Cymbalta, Dr. Bautista planned to prescribe "capsaicin cream (a topical analgesic) for his reported pains." (*Id.*)

McCray had another appointment with Dr. Bautista on November 21, 2019. (*Id.* ¶ 50.) There, he again complained about "shooting pain behind his left clavicle and paresthesia" in the fourth and fifth fingers on his left hand. (*Id.*) Further, in addition to reiterating his concerns over the side effects of Nortriptyline and Cymbalta, McCray reported that the capsaicin cream had not been effective. (*Id.*) Dr. Bautista made essentially the same assessment as he had at the previous appointment and prescribed Neurontin—a different medication for nerve pain. (*Id.*) He also renewed McCray's waist-chain permit. (*Id.*)

For purposes of the present dispute, the final key appointment between Dr. Bautista and McCray occurred on February 20, 2020. (*Id.* ¶ 51.) McCray reported that his neuropathy symptoms were still ongoing and, in response, Dr. Bautista increased the dosage of Neurontin prescribed for McCray. (*Id.*) Dr. Bautista also provided medication for cold and cough symptoms McCray had developed. (*Id.*) And he instructed McCray to return for another appointment in four months. (*Id.*)

The record does not indicate that the follow-up appointment with Dr. Bautista ever occurred. Instead, in August 2020, McCray had an appointment with a new doctor, Dr. Henze. (*Id.* ¶ 52.) McCray complained about "pain and numbness in his left upper extremity" and neck pain. (*Id.*) Dr. Henze ordered "lab tests and x-rays of [McCray's] cervical spine and his elbow."

5

(*Id.*) Although the test results and x-rays were generally normal, Dr. Henze noted in a September 2020 appointment that McCray's symptoms could be related to carpal tunnel syndrome and thus referred him for an electromyography test at the University of Illinois at Chicago Hospital. (*Id.* ¶ 53). This led to a chain of events that ultimately resulted in McCray receiving an MRI on his right wrist in October 2021 and one on his left wrist in November 2021; the findings of each MRI were consistent with carpal tunnel syndrome. (*Id.* ¶¶ 54–67.) On January 26, 2023, McCray had an appointment with an orthopedic specialist who confirmed the diagnosis of carpal tunnel syndrome and discussed possible solutions, such as surgery. (DRPSAF ¶ 31.) McCray received injections for temporary relief. (*Id.*)

McCray filed a *pro se* complaint in January 2021. (Compl., Dkt. No. 1.) The operative complaint was filed on October 4, 2021. (First Am. Compl. ("FAC"), Dkt. No. 17.) McCray brings a § 1983 claim against Dr. Bautista, alleging that he provided constitutionally inadequate medical treatment under the Eight Amendment. McCray further claims that Wexford—the entity that provides "medical care and treatment to inmates" at Stateville (PRDSF ¶ 3)—bears responsibility for the alleged violation of his Eight Amendment rights due to certain policies issued as part of its provider handbook ("Wexford Handbook").

## DISCUSSION

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). The Court must "consider all of the evidence in the record in the light most favorable to the non-moving party"—in this case, McCray—and "draw all reasonable inferences from that evidence in" his favor. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020)

(internal quotation marks omitted). That said, McCray still must "produce evidence sufficient to establish the elements essential to [his] claim." *Jackson v. Sheriff of Winnebago Cnty.*, 74 F.4th 496, 500 (7th Cir. 2023) (internal quotation marks omitted). "[I]nferences supported only by speculation or conjecture cannot defeat summary judgment." *Lam v. Springs Window Fashions, LLC*, 37 F.4th 431, 436 (7th Cir. 2022).

## I. Dr. Bautista

McCray argues that Dr. Bautista's treatment from December 2018 through February 2020 violated the Eighth Amendment. Specifically, McCray accuses Dr. Bautista of persisting in a course of ineffective treatment, failing to order adequate testing, and refusing to refer him to an outside specialist.

"The Eighth Amendment requires prisons to provide adequate medical care to prisoners." *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024). To hold Dr. Bautista responsible for constitutionally inadequate care, McCray must establish that Dr. Bautista acted with "deliberate indifference to [his] serious medical needs." *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "To evaluate such a claim in the prison medical context," courts "first examin[e] whether a plaintiff suffered from an objectively serious medical condition, and then determine[e] whether the individual defendant was deliberately indifferent to that condition." *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (internal quotation marks omitted). Also, the defendant's conduct must have injured the plaintiff. *Stockton*, 44 F.4th at 614. Defendants here challenge each of the required elements.

### A. Objectively Serious Medical Condition and Causation

First, Defendants argue that McCray did not suffer from a serious medical condition. "A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (internal quotation marks omitted). Defendants cite, for example, McCray's weightlifting during the relevant period as indicating that the pain in his wrist and arms could not have been that bad. (PRDSF ¶¶ 37–38.) But "a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit." *Roe*, 631 F.3d at 861. A reasonable jury could conclude that a carpal tunnel syndrome qualifies. *See Landis v. Shellhammer*, No. 20 CV 50447, 2023 WL 6276521, at *6 (N.D. Ill. Sept. 26, 2023) (characterizing as "debatable" the issue of "whether carpal tunnel constitutes a serious medical need"). A reasonable jury could credit McCray's repeated complaints of pain—his weightlifting notwithstanding—and a condition causing pain can constitute "an objectively serious medical condition." *Munson v. Newbold*, 46 F.4th 678, 682 (7th Cir. 2022). At the summary-judgment stage, McCray has satisfied the objective element of the test.

Defendants' challenge to the causation element fails for similar reasons. A delay in treatment, like the one at issue in this case, can support a claim of deliberative indifference if the plaintiff "provide[s] independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties v. Carter*, 836 F.3d 722, 730–31 (7th Cir. 2016), *as amended* (Aug. 25, 2016). Here, viewed in the light most favorable to McCray, the record shows that he repeatedly reported that he was in pain during his appointments with Dr. Bautista. Moreover, once McCray

began to be seen by Dr. Henze in 2020, he was diagnosed with carpal tunnel syndrome and received treatment targeted at that diagnosis. (Grochocinski Decl., Ex. 5 ("Jan. 26, 2023, Appointment Notes"), Dkt. No. 58-6.) A reasonable jury could infer that Dr. Bautista's course of treatment over the previous fourteen or so months delayed the correct diagnosis and effective treatment. *Cf. Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) ("A delay in providing antibiotics will necessarily delay the curing of the infection or possibly lead to its spread."). And therefore, a reasonable jury could find causation. *See Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010) (explaining that causation is typically a jury question).

### B.    Deliberate Indifference

The Court next turns to the subjective component of deliberative indifference, which is where the parties focus most of their attention. There is no question that Dr. Bautista knew about McCray's symptoms. Liability, however, requires that he "knew of and consciously disregarded a serious risk to [McCray's] health." *Clemons*, 106 F.4th at 635 (internal quotation marks omitted). "Deliberate indifference occupies a space slightly below intent and poses a high hurdle and an exacting standard requiring something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Stockton*, 44 F.4th at 615 (internal quotation marks omitted). "[A] difference of opinion among medical professionals" does not suffice. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). Nor does even "medical malpractice." *Esser*, 105 F.4th at 961. Rather, the plaintiff must "provide[] evidence from which a reasonable jury could conclude that the defendant didn't ***honestly*** believe his proffered medical explanation." *Zaya*, 836 F.3d at 805.

Here, McCray relies in large part on the allegedly ineffective nature of the treatment Dr. Bautista did provide. To be sure, "the defendant's persistence in a course of treatment known to be ineffective" could support a finding of deliberate indifference. *Davis v. Kayira*, 938 F.3d 910,

915 (7th Cir. 2019) (internal quotation marks omitted). But the record establishes that Dr.

Bautista did not persist in the same course of treatment. To the contrary, when McCray

complained about his ongoing symptoms, Dr. Bautista adjusted the treatment—sometimes by

increasing the dosage of McCray's medications, other times by switching medications. *Compare,*

*e.g.*, *Hall v. Sood*, 860 F. App'x 440, 442 (7th Cir. 2021) (finding no deliberate indifference

when the defendants "alter[ed] dosages or cho[se] new medications" in response to the plaintiff's

complaints that the prescriptions "did nothing" and were causing side effects)*, with, e.g.*,

*Goodloe v. Sood*, 947 F.3d 1026, 1031–32 (7th Cir. 2020) (finding deliberate indifference when

the defendant prescribed a treatment in April 2014, recognized the treatment was ineffective as

of June 2014, but then continued the same treatment for another three months before referring

the plaintiff to a specialist). Simply put, this is not a case where "the patient repeatedly

complained of enduring pain with no modifications in care." *Petties*, 836 F.3d at 731.

What is more, the record suggests that Dr. Bautista's treatment, to some degree, aligned

with McCray's symptoms. For example, as of May 2021, McCray was still taking the nerve-pain

medication Dr. Bautista had prescribed in late 2019 based on his diagnosis of neuropathy, and

with advantageous results to boot. (PRDSF ¶¶ 50–51, 63.) "Evidence that a defendant's course of

treatment was consistent with other ailments may prove fatal to a deliberate indifference claim."

*Stockton*, 44 F.4th at 616. Granted, Dr. Bautista may have been negligent in failing to recognize

the risk of carpal tunnel syndrome. However, negligence does not equate deliberate indifference.

*Esser*, 105 F.4th at 961. Here, "[t]here is no evidence—and certainly no expert testimony—to

suggest [Dr. Bautista] clearly should have known better" than to treat McCray in the manner he

did. *Davis*, 938 F.3d at 915; *see also Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021) ("[A]

physician's delay, even if brief, in referring an inmate to a specialist in the face of a ***known need*** for specialist treatment may also reflect deliberate indifference." (emphasis added)).

On that note, the divergent approaches of other medical providers do not suffice to show deliberate indifference. McCray first points to Dr. Okezie, who saw McCray before Dr. Bautista did and had initially recommended referring McCray to a specialist for his "left shoulder pain." (PRDSF ¶ 17.) Dr. Bautista insists he does not recall seeing the referral recommendation when he was reviewing the treatment notes for McCray. (DRPSAF ¶ 17.) But even assuming he did see the recommendation, a mere disagreement among practitioners does not constitute deliberate indifference. *Zaya*, 836 F.3d at 805. Put another way, the earlier referral recommendation does alone not mean that Dr. Bautista's decision to treat McCray through medication and physical therapy, as the alternative treatment plan contemplated, "amounted to such a substantial departure from accepted professional judgment, practice, or standards as to allow a reasonable jury to find deliberate indifference." *Stockton*, 44 F.4th at 616. In fact, McCray reported in July 2019 that the physical therapy had helped with the "left shoulder joint pain." (PRDSF ¶ 45.)

As for Dr. Henze, her treatment beginning in August 2020 has little probative value. At that point, McCray had not seen Dr. Bautista for roughly eight months; such a large temporal gap prevents an apples-to-apples comparison between Dr. Henze's treatment decisions and Dr. Bautista's treatment decisions. *Cf. Duckworth v. Ahmad*, 532 F.3d 675, 679–80 (7th Cir. 2008) (holding there was no deliberate indifference even when "the benefit of hindsight" revealed "a better route" of treatment). Furthermore, McCray lacks evidence that, despite Dr. Henze's divergent approach, Dr. Bautista acted so outrageously that "no minimally competent professional would have" taken the approach he did. *Jackson*, 105 F.4th at 962 (internal quotation marks omitted).

Lastly, McCray observes that Dr. Bautista did not follow certain treatment protocols that Wexford publishes. The "fail[ure] to follow an existing protocol" may indeed be indicative of deliberate indifference. *Petties*, 836 F.3d at 729; *see also Morris v. Obaisi*, No. 17-CV-05939, 2023 WL 2745508, at *7 (N.D. Ill. Mar. 31, 2023) ("Given the divergence from the Wexford protocols, a jury could plausibly 'infer that the doctor knew better than to pursue the course of treatment that he did.'" (quoting *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019))). In particular, McCray references two Wexford treatment protocols to illustrate Dr. Bautista's deliberate indifference: the protocol for carpal tunnel syndrome and the protocol for shoulder injuries with "acute pain" but no "Fx or Dislocation." (DRPSAF ¶¶ 10–14.)

On the facts in the record, however, neither policy undermines the course of treatment Dr. Bautista prescribed. For one thing, McCray does not explain why Dr. Bautista should have followed the recommended treatment for carpal tunnel syndrome when he had not diagnosed that condition. *See Davis*, 938 F.3d at 915 (holding there was no deliberate indifference when the evidence indicated the defendant had reasonably diagnosed and treated a different condition). As for the shoulder injury, no reasonable jury could find that failing to follow Wexford's protocol constituted deliberate indifference when the treatment provided—physical therapy—ultimately proved effective in alleviating the shoulder pain, as McCray himself reported. *See, e.g.*, *Aldridge v. Wexford Health Sources, Inc.*, No. 16 C 09477, 2019 WL 6497029, at *5 (N.D. Ill. Dec. 3, 2019) ("[T]hough success is not the bellwether of adequate treatment (patients sometimes have poor outcomes despite receiving stellar treatment), it is nevertheless significant to note that the treatment provided to [the plaintiff] was effective, at least for a period of time.").

Again, the Eighth Amendment requires more than "medical malpractice" for liability. *Esser*, 105 F.4th at 961. Here, McCray cites no evidence to call into question that Dr. Bautista

"honestly believed in the diagnosis he rendered" and provided treatment accordingly, even if Dr. Bautista ultimately was incorrect in failing to recognize that McCray may have had carpal tunnel syndrome. *Stockton*, 44 F.4th at 616. McCray has therefore failed to demonstrate deliberate indifference, and summary judgment must be entered in favor of Dr. Bautista.

## II. Wexford

Next, McCray asserts an Eighth Amendment claim against Wexford itself, arguing that it bears responsibility for his poor medical treatment. To determine whether a private corporation, as opposed to its employees, is responsible for the alleged constitutional deprivation, courts use the test for municipal liability set forth in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 664 (1978). *Thomas*, 991 F.3d at 773. As such, "[t]o succeed on a § 1983 claim against a private corporation acting under color of state law, a plaintiff must show a corporate custom or practice so widespread that it would be sufficient to state a *Monell* claim if the defendant were a municipal government." *Dorsey v. Varga*, 55 F.4th 1094, 1102 (7th Cir. 2022).

The Seventh Circuit has identified "three types of actions" that can give rise to municipal liability under *Monell*: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (internal quotation marks omitted). In addition, the plaintiff must demonstrate "municipal fault"—either through a facial violation or evidence that the municipality "consciously disregarded" the "obvious," unconstitutional consequences of its actions. *Id.* at 986–87. *Monell* further requires that "the municipality's action was the 'moving

force' behind the federal-rights violation." *Id.* at 987 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)). That is, "the plaintiff must show a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *Id.* (quoting *Brown*, 520 U.S. at 404).

McCray argues for *Monell* liability based on express policies. In particular, he identifies two express policies from the Wexford Handbook that, according to him, resulted in the violation of his constitutional rights. First, he cites language that he believes encourages employees to be deliberately indifferent to objectively serious medical conditions. And second, he posits that the Wexford Handbook enables employees to deny needed medical care due to cost considerations. Neither theory passes muster at the summary-judgment stage.

To start, municipal liability requires an underlying constitutional violation. *E.g.*, *Deeren v. Anderson*, 72 F.4th 229, 237 (7th Cir. 2023). Here, McCray focuses almost entirely on the conduct of Dr. Bautista, who, as discussed above, provided constitutionally adequate care. He fails to develop a separate basis for finding a violation, nor is one apparent in the record. Thus, McCray does not satisfy this threshold requirement of *Monell* liability. Moreover, even assuming Dr. Bautista's treatment did violate the Eighth Amendment, McCray does not direct the Court to evidence linking his treatment to the policies from the Wexford Handbook. He instead vaguely theorizes that those policies could have influenced the treatment Dr. Bautista provided. Such speculation does not suffice at the summary-judgment stage. *Lam*, 37 F.4th at 436.

Even overlooking those deficiencies, both of McCray's theories misconstrue the language of the Wexford Handbook. As to his first theory, McCray cites a provision that reads in relevant part as follows: "The DOC/county (and medical contractor) is prohibited from practicing 'deliberate indifference to serious medical needs' in the course of medical service. We are

obligated to provide medically necessary care consistent with community standards."
(Grochocinski Decl., Ex. 4 ("Wexford Handbook") at 19, Dkt. No. 58-5 (emphasis omitted).) A
later provision adds, "Conditions of lesser significance, of course, should not be
neglected. . . . But the major concern was for serious medical needs—those basically threatening
a patient's life and/or limb." (*Id.*) McCray combines these provisions to read the Wexford
Handbook as prohibiting "deliberate indifference" only in the context of "serious medical
needs," referring to those conditions that "basically threaten[] a patient's life and/or limb." (*Id.*)
Since a deliberate-indifference claim may rest on a broader category of medical conditions, *Roe*,
631 F.3d at 857, McCray contends that the Wexford Handbook encourages Eighth Amendment
violations.

In making this argument, however, McCray overlooks key clarifying language from the
provisions. Namely, the Wexford Handbook requires employees to "provide medically necessary
care consistent with community standards;" it also specifies that providers should not "neglect[]"
less serious conditions. (Wexford Handbook at 19.) Whatever priority the Wexford Handbook
places on high-risk conditions, it does not direct medical providers to offer constitutionally
inadequate care when dealing with other conditions. *See Calhoun v. Ramsey*, 408 F.3d 375, 379
(7th Cir. 2005) (explaining that "[t]he express policy theory" of *Monell* liability refers to a policy
that "explicitly violates a constitutional right when enforced"). And McCray never argues that
gaps in the express policy warrant liability; such a theory would "typically" require "evidence of
a prior pattern of similar constitutional violations," which he does not offer. *Taylor v. Hughes*, 26
F.4th 419, 435 (7th Cir. 2022) (internal quotation marks omitted).

McCray's second theory likewise mischaracterizes language from a provision in the
Wexford Handbook. He cites language that mentions "cost" as a "consideration"—one "of

several possible variables"—related to the choice between "alternative treatment approaches."
(Wexford Handbook at 22.) McCray suggests that Dr. Bautista's decision not to refer him to a
specialist, as well as the denial of Dr. Okezie's initial referral recommendation, reflects an
improper prioritization of costs as authorized by the Wexford Handbook. Indeed, the Eighth
Amendment does not permit "administrative convenience and cost" to be "considered to the
exclusion of reasonable medical judgment about inmate health." *Roe*, 631 F.3d at 863 (emphasis
omitted).

Yet the Seventh Circuit allows that "administrative convenience and cost may be, in
appropriate circumstances, permissible factors for correctional systems to consider in making
treatment decisions." *Id.* (emphasis omitted). To that end, the Wexford Handbook names cost as
just one of the potential factors that can affect a treatment decision; it does not prioritize cost to
the detriment of medical judgment. *See, e.g.*, *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1105 (N.D.
Ill. 2018) ("Evidence showing that cost is one of a group of variables does not show that cost is
the preeminent variable."). Certainly, there is no evidence here that an assessment of cost when
deciding the treatment for McCray—an assessment Dr. Bautista attests he never made (Bautista
Decl. ¶ 68)—would be *per se* unconstitutional. So, as before, facial application of this express
policy does not lead to a constitutional violation, which is the only argument McCray makes for
liability. *Calhoun*, 408 F.3d at 379.

In short, McCray proffers inadequate evidence for a reasonable jury to find Wexford
liable pursuant to the *Monell* doctrine. He cites no evidence of an underlying constitutional
violation or causation. And even putting those issues aside, the language of the Wexford
Handbook does not expressly promote unconstitutional treatment in the manner McCray
suggests. Wexford is thus entitled to summary judgment in its favor.

**CONCLUSION**

For the reasons explained above, Defendants' motion for summary judgment (Dkt. No. 50) is granted. The Clerk will enter judgment in favor of Defendants.


ENTERED:


Dated:  September 18, 2024

_____
Andrea R. Wood
United States District Judge